**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| _____ : | | |
| JOHN DOE, : | No. _____ | |
| *Plaintiff*, : | | |
| : | | |
| v. : | **COMPLAINT FOR INJUNCTIVE** | |
| : | **AND DECLARATORY RELIEF** | |
| PUBLIC COMPANY ACCOUNTING : | | |
| OVERSIGHT BOARD, : | | |
| : | | |
| *Defendant*. : | | |
| _____: | | |

      Plaintiff John Doe[1] seeks declaratory and injunctive relief to stop defendant Public Company Accounting Oversight Board ("Board") from continuing its unconstitutional and unlawful prosecution of him in secret disciplinary proceedings ostensibly blessed by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").  The Board's prosecution of Plaintiff violates the U.S. Constitution in numerous respects and is inflicting significant here-and-now injury on Plaintiff.

      More specifically, and as detailed below:

(1)     the Board's disciplinary adjudication process unlawfully usurps and purports to relocate the "judicial Power of the United States"—which Article III of the Constitution vests exclusively in federal "courts" ordained and established by Congress—by vesting that power in a private corporation whose legitimate functions, if any, are solely *executive* rather than judicial;

(2)     the Board, its prosecution staff, and its hearing officer are private parties, not government employees, yet they wield punitive executive law enforcement power against Plaintiff under color of federal law without meaningful direction and supervision by any principal officer of the executive branch in violation of Article II of the Constitution;

---

[1] "John Doe" is a pseudonym used to protect Plaintiff's true identity.  Accompanying this complaint is a motion for leave to allow Plaintiff to prosecute this lawsuit pseudonymously.

(3) the Board hearing officer assigned to superintend and adjudicate the disciplinary proceedings against Plaintiff is an inferior constitutional officer who has not been lawfully appointed under the Appointments Clause of Article II of the Constitution;

(4) the Board hearing officer is also protected by multiple layers of protection from removal by the President in violation of Article II of the Constitution;

(5) the Board's disciplinary proceedings deprive Plaintiff of his right to a jury trial in violation of the Sixth and Seventh Amendments to the Constitution;

(6) the Board's disciplinary process is systemically biased, secretive, and unfair in violation of the Due Process Clause of the Fifth Amendment to the Constitution and the "fair procedures" requirement of Sarbanes-Oxley Section 105(a); and

(7) the Board's prosecution is being funded by money raised and spent in violation of the Appropriations, Taxing, and Spending Clauses of Article I of the Constitution and the separation of powers principles enshrined in those clauses;

Plaintiff therefore respectfully requests that this Court enjoin the Board's disciplinary proceedings against Plaintiff, declare them unconstitutional and otherwise unlawful, and grant such other relief as it deems appropriate.

## JURISDICTION AND VENUE

1. The Court has jurisdiction under Article III, section 2 of the United States Constitution and 28 U.S.C. §§ 1331, 1367, and 1651. *See also Free Enter. Fund v. Pub. Co. Acct'g Oversight Bd.*, 561 U.S. 477, 489-91 (2010); *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 897 (2023).

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

3. Plaintiff John Doe is a citizen and resident of Tennessee. He is an accountant employed by a firm that is registered with the Board as a "registered public accounting firm" within the meaning of Sarbanes-Oxley § 2(a)(12), 15 U.S.C. § 7201(a)(12). Until the Board commenced

2

its secret disciplinary proceedings against him in September 2023, he had never been the subject of any disciplinary charges in his otherwise unblemished, 30+ year career as an accountant.

4.      Defendant Board is a private, nonprofit corporation created by Sarbanes-Oxley § 101, 15 U.S.C. § 7211, and organized under the laws of the District of Columbia.  The Board is headquartered in the District of Columbia and has at least a dozen other offices across the United States.  It has over 800 employees and claims regulatory jurisdiction over more than 1,500 registered public accounting firms worldwide (including 17 firms in Tennessee) along with innumerable individuals employed by and associated with those firms.

## FACTS

### A.      "This Unprecedented Extra-Constitutional Stew"[2]

5.      Sarbanes-Oxley created the Board as a private, nonprofit, non-governmental corporation under the laws of the District of Columbia:

> The Board shall not be an agency or establishment of the United States Government, and, except as otherwise provided in this Act, shall be subject to, and have all the powers conferred upon a nonprofit corporation by, the District of Columbia Nonprofit Corporation Act.  No member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by reason of such service.

15 U.S.C. § 7211(b).  As the Supreme Court noted in *Free Enterprise Fund*, this allows the Board to "recruit its members and employees from the private sector by paying salaries far above the standard Government pay scale."  561 U.S. at 485.

6.      The Board is led by five members who are appointed as "inferior" constitutional officers by the Securities and Exchange Commission ("SEC") acting collectively as a "Head of Department" within the meaning of the Appointments Clause of the Constitution.  15 U.S.C.

---

[2] *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 713 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *rev'd* 561 U.S. 477 (2010).

3

§ 7211; *see generally Free Enter. Fund*, 561 U.S. at 484-87. Although Sarbanes-Oxley, as enacted, permitted SEC to remove Board members only "for good cause," 15 U.S.C. § 7211(e)(6), the Supreme Court severed that removal limitation from the statute in *Free Enterprise Fund* to preserve the constitutionality of the Board members' tenure protection. 561 U.S. at 508-10.

7.     Notwithstanding its legal status as a private corporation, the Board "is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry." *Id.* at 484-85.

> Every accounting firm—both foreign and domestic—that participates in auditing public companies under the securities laws must register with the Board, pay it an annual fee, and comply with its rules and oversight. The Board is charged with enforcing the Sarbanes-Oxley Act, the securities laws, the Commission's rules, its own rules, and professional accounting standards. To this end, the Board may regulate every detail of an accounting firm's practice, including hiring and professional development, promotion, supervision of audit work, the acceptance of new business and the continuation of old, internal inspection procedures, professional ethics rules, and "such other requirements as the Board may prescribe."

*Id.* at 485 (internal citations omitted).

8.     The Board's investigative, prosecutorial, and pseudo-judicial adjudicative powers are massive and largely unchecked. After years of investigation, the Board can impose severe punitive sanctions against individual accountants and accounting firms within its regulatory reach, up to the permanent revocation of a firm's registration, a permanent ban on an individual associating with any Board-registered accounting firm, and civil monetary penalties of up to $1.1 million per violation for natural persons and $22 million per violation for firms. 15 U.S.C. § 7215(c)(4); 17 C.F.R. § 201.1001. These felony-sized penalty amounts are *five times higher* for natural persons and *20 times higher* for firms than the maximum penalties SEC itself can impose. *See, e.g.*, 15 U.S.C. § 78u-2(b); 17 C.F.R. § 201.1001. A willful violation of any Board rule is treated as a willful violation of the securities laws, and thus as a federal crime punishable by up to

4

20 years' imprisonment or $25 million in fines ($5 million for a natural person). 15 U.S.C. §§ 78ff(a), 7202(b)(1).

9.      Employment bans imposed by the Board on individual accountants can be extremely broad and onerous. For example, the Board can ban individual accountants from being "associated with" registered public accounting firms in even a non-accounting capacity; ban them from associating with any issuer, broker, or dealer in any financial capacity; and even require them to obtain prior Board or SEC approval before taking any job whatsoever (professional or otherwise) with any issuer, broker, or dealer. 15 U.S.C. § 7215(c)(7)(B).

10.     Yet as nominally private actors, the Board and its staff are exempt from many of the basic checks, balances, and transparency requirements designed to protect individuals from overzealous governmental coercion and punishment. For example, upon information and belief, the Board and its staff are not constrained by the Administrative Procedure Act, the Sunshine Act, the Freedom of Information Act, the Advisory Committee Act, the Equal Access to Justice Act, the Paperwork Reduction Act, and countless other laws applicable to traditional government regulators. Indeed, it is not clear whether Board staff members (other than perhaps hearing officers) are required, like their governmental counterparts, to take an oath to "support and defend the Constitution" and to "bear true faith and allegiance to the same." 5 U.S.C. § 3331.

11.     Congress has increasingly relied on various similar models of outsourcing vast governmental powers to private actors who are neither elected by the citizenry nor appointed by the President with the Senate's advice and consent. The trend has elicited understandable scorn from several current Supreme Court Justices in cases involving other nominally private regulators:

> One way the Government can regulate without accountability is by passing off a
> Government operation as an independent private concern. Given this incentive to
> regulate without saying so, everyone should pay close attention when Congress

5

"sponsor[s] corporations that it specifically designate[s] not to be agencies or establishments of the United States Government."

. . . .

When it comes to private entities . . . there is not even a fig leaf of constitutional justification. Private entities are not vested with "legislative Powers." Art. I, § 1. Nor are they vested with the "executive Power," Art. II, § 1, cl. 1, which belongs to the President . . . . By any measure, handing off regulatory power to a private entity is "legislative delegation in its most obnoxious form."

*Dept. of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 57, 62 (2015) (Alito, J., concurring) (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 390 (1995) and *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)). *Accord Texas v. Comm'r of Internal Revenue*, 596 U.S. --, 142 S. Ct. 1308, 1308 (2022) (Alito, J., joined by Thomas, J. and Gorsuch, J.) ("To ensure the Government remains accountable to the public, it cannot delegate regulatory authority to a private entity" (internal citations omitted)).

12.     To be sure, the Board is subject to at least *some* constitutional limitations, such as the requirement that its leadership be constitutionally appointed and accountable to the President. *See Free Enter. Fund*, 561 U.S. at 492. After all, the Board exercises vast powers that are "typically carried out" by governmental officials. *Id.* at 504-05. As one scholar has explained, Congress initially considered creating the Board as a division or office within the SEC, a government agency, but it deliberately rejected that model because it wished to create a "strong, independent" private regulator that would wield "massive power, unchecked power, by design." *See* Donna M. Nagy, *Is the PCAOB a "Heavily Controlled Component" of the SEC?: An Essential Question in the Constitutional Controversy*, 71 U. Pitt. L. Rev. 361, 375-85 (2010) (quoting statement of Sen. Gramm). It is no surprise, therefore, that current Supreme Court justices have variously described the Board as "highly unusual," *Free Enter. Fund*, 561 U.S. at 505, "uniquely

6

structured," *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 668 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), and an "unprecedented extra-constitutional stew," *id*. at 713.

**B.     The Board's Usurpation and Purported Relocation of Article III Judicial Power**

13.     Article III of the Constitution vests "the judicial Power of the United States" in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST., Art III, § 1.  It further provides that the judges who serve on such courts "shall hold their Offices during good Behaviour," otherwise known as life tenure.  *Id*.  Article II of the Constitution relatedly provides for such judges to be appointed by the President with the advice and consent of the Senate.  *Id*. Art II, § 2, cl. 2.

14.     The Board is not a "court" ordained and established by Congress.  Rather, as previously noted, Congress ordained and established the Board as a private corporation.  As such, the Board has no lawful power to decide cases and controversies, least of all ones to which it is an interested party, such as the one it is prosecuting against Plaintiff.

15.     Likewise, the Board's hearing officer is not a life-tenured "judge" within the meaning of Article III.  A private citizen, he was appointed by the five SEC-appointed Board members, with SEC's after-the-fact approval.  Neither the President nor the Senate played any formal role in his appointment.

16.     To the extent the Board exercises any lawful power, that power is and must be exclusively *executive* in nature, not judicial.  Thus, neither the Board nor its hearing officer possesses any lawful power to decide the Board's disciplinary proceedings against Plaintiff—nor any other case or controversy for that matter.  By doing so, the Board and its hearing officer are unlawfully usurping the "judicial Power of the United States" and purporting to relocate it from

7

the courts of the United States—where it is properly and exclusively vested—to a private corporation nominally overseen by an independent executive agency.

**C.      The Board's Unsupervised Exercise of Executive and Pseudo-Judicial Powers**

17.     One of the few theoretical checks on the Board's independence and massive power is the direction and supervision purportedly exercised by the presidentially appointed, Senate-confirmed SEC commissioners who are "principal" constitutional officers under the Appointments Clause of the Constitution.  When the Board flexes its delegated *legislative* muscle through rulemaking, for example, SEC commissioners play a critical gatekeeper function:  Before any Board rule becomes effective and can bind anyone, it must first be approved by the SEC commissioners through public rulemaking.  15 U.S.C. § 7217(b).

18.     But SEC commissioners play no similar gatekeeper role when the Board flexes its enormous *executive* and *pseudo-judicial* powers—*i.e.*, the investigative, disciplinary, and adjudicative powers challenged in this case.  To the contrary, the Board wields those executive and pseudo-judicial powers autonomously and unilaterally, with *zero* real-time direction or supervision by the presidentially appointed SEC commissioners.

19.     For example, upon information and belief, SEC commissioners—the only "principal" constitutional officers anywhere in sight—play no role in deciding who the Board will investigate; what should be investigated; what documentary evidence and testimony should be demanded; from whom documents and testimony should be demanded; how voluminous and burdensome those demands should be; whether formal disciplinary charges should be filed; if so, who should be charged and what charges should be alleged; what evidence should be admitted and considered; how to weigh that evidence; whether to accept a negotiated settlement; and what sanctions should be imposed in any settlement.

20.     All those executive and pseudo-judicial powers are left to the largely unfettered discretion of the Board—or more precisely, as explained below, to the discretion of private citizens employed by the Board.

21.     Upon information and belief, the only time SEC commissioners play any meaningful role in a typical Board investigation or disciplinary proceeding is in the exceptionally rare cases where the target of a Board investigation:  (1) is formally charged with wrongdoing after investigation by Board staff; (2) does not settle or default; (3) is sanctioned after a full disciplinary proceeding including an evidentiary hearing on the merits before a Board hearing officer; (4) appeals the hearing officer's decision to the Board members; (5) loses the appeal at the Board level; *and* (6) subsequently appeals the adverse result to the SEC commissioners (or SEC reviews the sanctions on its own initiative—a theoretical possibility under the relevant statute but one that, to Plaintiff's knowledge, has never in fact happened).  This full gauntlet typically takes many years and is enormously expensive and stressful for the exceptionally rare Board targets who endure the entire process.

22.     For these reasons among others, most Board investigative targets settle rather than defend themselves.  Over the Board's entire 22-year history, only *eight* of its several hundred disciplinary cases—about two percent—have ever been appealed to SEC's commissioners.  (A ninth appeal was filed on January 30, 2024, but it will likely be several months—and perhaps a year more—before the SEC commissioners decide that case.)  The last time SEC decided such an appeal was nearly five years ago in May 2019.  And only two of the eight Board cases ever reviewed by the SEC—that is, less than one half of one percent of all Board enforcement cases thus far made public—have ever been subsequently reviewed by any federal court.[3]  In its hundreds

---

[3] In one of the two cases to reach federal court, the court ultimately set aside the Board's sanctions and the charges were dismissed, but that result came more than *nine years* after the Board initiated the case.  *Laccetti v. SEC*, 885 F.3d

of other enforcement cases, the Board has investigated, charged, and penalized its targets with no meaningful direction, supervision, or after-the-fact review by even SEC's commissioners, much less by any Article III judge.

23.     This absence of SEC direction and supervision is especially problematic because even the five SEC-appointed Board members—the Board's only validly appointed constitutional officers—play only a limited, episodic role in typical Board investigative or disciplinary proceedings.  Upon information and belief, those proceedings are conducted and supervised almost entirely by the Board's private staff employees, none of whom is constitutionally appointed even as an inferior officer.  Upon information and belief, these employees make countless significant, discretionary, binding decisions over the years-long course of typical Board investigations and disciplinary proceedings, without any day-to-day direction or supervision by even the SEC-appointed Board members, much less SEC's commissioners.

24.     Upon information and belief, the Board members are meaningfully involved at only three discrete points in a typical investigation and disciplinary proceeding: (1) they typically review and approve the enforcement staff's decision to commence a formal investigation; (2) after the staff's investigation is completed, they typically review and approve the staff's decision to file formal charges (and in most cases they approve one or more contemporaneous settlement agreements already negotiated and finalized by the staff); and (3) after a hearing officer has conducted hearings and issued a decision, they decide any appeals from that decision.  At all other times throughout the years-long process, upon information and belief, Board members are largely oblivious to what their private staff employees are doing in any given case.

---

724 (D.C. Cir. 2018).  In the other, the court upheld the Board's sanctions in an unpublished order issued more than six years after the Board initiated the case.  *Kabani & Co. v. SEC*, 733 F. App'x 918 (9th Cir. 2018).

25.     Yet the coercive and discretionary power wielded by these private staff employees is extraordinary.  For example, when conducting investigations, staff employees routinely issue intrusive "accounting board demands" that can force recipients to search for and produce troves of private documents and other information and to submit to multiple days of interrogation under oath, all backed by the threat of punishment for "noncooperation"—which can include loss of livelihood, substantial monetary penalties, and even incarceration—if they fail to comply.  The cost and burden of complying with these demands can be staggering.  And the Board allows no process by which recipients of these intrusive and coercive staff commands can seek even the Board members' intervention (much less that of the SEC commissioners or a court) to challenge the appropriateness or breadth of the commands.  Unsurprisingly, most Board targets cannot afford to risk their livelihoods and life savings—not to mention the wrath of their principal regulator and potential incarceration—so they predictably choose obedience to staff demands, thereby forgoing any meaningful opportunity to challenge those demands as unconstitutional or otherwise improper.

26.     Board disciplinary proceedings that follow staff investigations are no less coercive and no less expensive to defend.  The Board's procedural rules and hearing officer orders require respondents to comply with numerous commands and deadlines, again upon threat of punishment for noncooperation or being found in default.  Respondents theoretically may move for "summary disposition" of charges where, for example, the undisputed facts demonstrate that the charges are legally deficient, but Board hearing officers have broad discretion to summarily defer or deny such motions without even requiring Board prosecutors to articulate a legitimate reason why the charges should not be promptly dismissed to avoid unnecessary litigation and expense.  And as with unjustified staff investigative demands, Board rules forbid respondents from requesting

11

interlocutory review by even the Board members (much less by SEC commissioners or a court), no matter how perfunctory or erroneous the hearing officer's decisions might be.

27.   To reiterate, *all* of this core executive and pseudo-judicial activity is performed and superintended by private citizens, none of whom is constitutionally appointed as even an "inferior" officer of the United States.  Upon information and belief, the activity is subject to only limited, sporadic direction and supervision by the Board members, while SEC's commissioners—the only principal constitutional officers within the vicinity—are entirely uninvolved and oblivious to the facts and proceedings as this vast and coercive power is wielded against regulated accountants and accounting firms over the course of a multi-year process.

28.   A target of investigation and disciplinary prosecution by the Board's private-sector employees theoretically has the right to appeal any sanction imposed by the hearing officer to the SEC-appointed Board members (and then to SEC and, finally, to a federal appeals court, as previously noted), but for most targets that prospect of eventual appellate review is not only cost-prohibitive but ephemeral.  Of the several hundred targets investigated and prosecuted by Board staff members over the Board's 22-year history, very few have had the resources and perseverance to appeal their sanctions even to the Board members, much less to SEC or a federal court.  As best Plaintiff can tell from the available public record, targets in only 12 Board enforcement cases have ever appealed their sanction even to the Board members, and the last time those Board members decided such an appeal on the merits was more than six years ago (in December 2017).

D.    The Hearing Officer's Unconstitutional Appointment and Multi-Layered Removal Protection

29.   The unsupervised exercise of vast executive and pseudo-judicial adjudicative power by private citizens against accountants and firms is not the only constitutional defect that plagues the Board's disciplinary process.  Board disciplinary hearings are superintended and

12

adjudicated by a single hearing officer who has authority and discretion to make numerous procedural and substantive determination that impact the fate of respondents like Plaintiff. But that hearing officer lacks a constitutionally valid appointment to exercise such power and is unconstitutionally protected by multiple layers of protection from removal by the President.

30.     The hearing officer unilaterally controls the disciplinary proceedings and presides over any evidentiary hearing afforded to the accused accountant or firm. The hearing officer's powers include obtaining a court reporter to administer oaths and affirmations; supervising discovery, including the issuance of Board demands and requests for documents and testimony; receiving relevant evidence and ruling on the admissibility of evidence and offers of proof; holding, presiding over, and mandating attendance at prehearing conferences; deciding motions; hearing and examining witnesses; determining whether to draw adverse evidentiary inferences from assertions of Fifth Amendment rights; adjudicating the merits of the case; determining liability; imposing sanctions; and generally "regulating the course of the proceeding and the conduct of the parties and their counsel." *See generally* Board Rule 5200(c). As that copious list suggests, the hearing officer exercises authority comparable to that of an administrative law judge ("ALJ") at the SEC, who in turn "exercises authority 'comparable to' that of a federal district judge conducting a bench trial," and thus is an inferior officer requiring constitutional appointment pursuant to the Appointments Clause. *Lucia v. SEC*, 138 S. Ct. 2044, 2049 (2018) (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)); *Freytag v. Commissioner*, 501 U.S. 868, 881-82 (1991) *cf. Alpine Securities Corp. v. FINRA*, No. 23-5129, 2023 WL 4703307 (D.C. Cir. July 5, 2023) (mem.) (per curiam) (Walker, J., concurring) ("FINRA's hearing officers are near carbon copies of [SEC] ALJs").

13

31.     Yet the Board hearing officer assigned to superintend and decide Plaintiff's case lacks a constitutionally valid appointment as an inferior officer.  He was originally employed by the Board in 2013, apparently with no formal role played by SEC in his hiring.  In April 2019—after the Supreme Court held in *Lucia* that SEC ALJs were inferior officers lacking lawful appointments pursuant to the Appointments Clause, thus raising concerns that Board hearing officers were similarly tainted—the Board purported to "appoint" the same hearing officer with SEC's approval.  *See* PCAOB Press Release, "Marc B. Dorfman Sworn in as the PCAOB's Chief Hearing Officer," Apr. 8, 2019, https://pcaobus.org/news-events/news-releases/news-release-detail/marc-b-dorfman-sworn-in-as-the-pcaob-s-chief-hearing-officer_699.

32.     But the Board lacks constitutional or statutory power to appoint inferior constitutional officers—with or without SEC approval.  The Appointments Clause authorizes the appointment of inferior officers only by the President, the courts, or the "Heads of Departments." U.S. Const. Art. II, § 2, cl. 2.  The Board is none of the above.

33.     The Appointments Clause further allows for appointment of inferior officers only when Congress has vested that power in a designated official or entity "by Law."  *Id.*  Congress has not vested in the Board the power to appoint inferior officers.  Rather, whereas Congress *has* empowered SEC to appoint both its own "*officers*, attorneys, economists, examiners, and other employees," 15 U.S.C. § 78d(b)(1) (emphasis added), as well as the officer-members of the Board, *id.* § 7211(e), Congress by contrast has empowered the Board to appoint only its own "employees, accountants, attorneys, and other agents," *id.* § 7211(f)(4)—not officers.

34.     Board hearing officers also enjoy unconstitutional, multi-layered protection from removal by the President that is at least as impenetrable as that enjoyed by SEC ALJs and, before *Free Enterprise Fund*, by the Board members themselves.  Should the President wish to remove

14

the Board's hearing officer from office, the President would first need to persuade a majority of SEC's tenure-protected commissioners that removal is warranted, and they in turn would have to persuade the Board members, who in turn would have to comply with whatever contractual, federal, and District of Columbia employment-law restrictions might further protect the hearing officer's tenure. The hearing officer is thus—no less so than the Board members themselves before the Supreme Court curtailed their tenure protection in *Free Enterprise Fund*—"safely encased within a Matryoshka doll of tenure protections" in violation of Article II of the Constitution. *Free Enter. Fund*, 561 U.S. at 497; *accord Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022) (SEC ALJs enjoy unconstitutional protection from presidential removal) (*cert. granted* in June 2023 and oral argument heard in November 2023).

**E.      The Board's Systemic Bias and Denial of Jury Trial Rights, Due Process of Law, and "Fair Procedures"**

35.      "A fair trial in a fair tribunal is the basic requirement of due process," *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)), as well as an "inexorable safeguard" of individual liberty, *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 304 (1937) (quoting *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 73 (1936)). This means not only actual fairness but the appearance of fairness. "Every procedure which would offer a possible temptation to the average man as a judge to forget the burdens of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused denies the latter due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). Congress paid obeisance to these principles when it created the Board as part of Sarbanes-Oxley by insisting that the Board establish "fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms." 15 U.S.C. § 7215.

36.     However, Board disciplinary proceedings utterly fail the test of fairness and due process of law in numerous respects, as detailed below.

### i.     The Board's Incompatible Dual Roles as Both Accuser and Judge

37.     One of the bedrock prerequisites of fairness and due process of law is that adjudicators must not decide their own cases. *See, e.g., Williams v. Pennsylvania*, 579 U.S. 1, 8-9 (2016); *In re Murchison*, 349 U.S. 133, 136-37 (1955). In Board disciplinary proceedings such as the one commenced against Plaintiff, however, that is exactly what happens. Both the prosecutors and the hearing officer are paid employee-agents hired by the Board to perform the Board's statutorily assigned duties pursuant to delegated authority. They all "report up" to the Board members on whose behalf they take all their actions.

38.     Before the Board commences a disciplinary proceeding against a respondent such as Plaintiff, Board members typically receive secret written and/or oral presentations from their prosecutorial staff and may engage in related oral and written communication with the same staff about the merits of the case, all designed to convince the Board members that the respondent is guilty of the staff's proposed charges. The respondent is excluded from these presentations and communications, and thus has no means of learning their substance or refuting their content, because, upon information and belief, the Board shrouds them under the claim of attorney-client privilege. Although a respondent typically is permitted to submit a written presentation to the Board members at this stage, many decline or cannot afford to do so and, in any event, unlike the prosecution staff—who can review a respondent's submission and secretly rebut it before the Board members—the respondent cannot see, hear, nor rebut the prosecution staff's *ex parte* presentations or other communications with the Board members during this black-box prejudgment process.

39.     Upon information and belief, the type of secret presentation and communications described in the preceding paragraph occurred in the days and weeks leading up to the Board's initiation of disciplinary charges against Plaintiff.  Plaintiff was invited to make a written submission to the Board's prosecutorial staff and did so through his then-counsel, but neither he nor his then-counsel had any other opportunity to communicate directly with the Board members or to hear, see, or subsequently learn about any *ex parte* communications between the Board members and their prosecutorial staff about Plaintiff's case.  Upon further information and belief, and presuming the responsible exercise of prosecutorial discretion, the staff's secret presentation and communications in Plaintiff's case achieved their intended purpose—to wit, they convinced the Board members that the charges against Plaintiff were meritorious and likely to be proved at a hearing, and that Plaintiff's asserted defenses to those charges lacked merit.

40.     In Plaintiff's case and others in which a respondent does not capitulate to a settlement, the Board members, after initiating their disciplinary charges, curiously purport to doff their prosecutorial hats and don the robes of impartial appellate judges awaiting any appeal from the hearing officer's decision on the charges they have just approved.  Despite having already participated in substantive *ex parte* presentations and communications with the prosecutors about the merits of the case, and despite having already determined, based on those presentations and communications, that the charges are well-founded and likely to be proved, they will eventually hear and decide the case *again*, under a purportedly *de novo* standard of review, if either party files an appeal.  In adjudicating those appeals, Board members necessarily evaluate and judge not only the decisions and conduct of their own employee-agents—which is problematic enough—but also their own prior determination that the charges were likely meritorious, thus raising obvious and profound doubt about their objectivity and ability to "hold the balance nice, clear and true" the

17

second time around.  To use an analogy the Board might recognize, this is akin to an "independent" audit firm auditing its own accounting work previously performed for the same client.

41.     What's more, some Board members—the putatively neutral appellate adjudicators-in-waiting—repeatedly broadcast in public their intention and desire to impose increasingly harsh enforcement sanctions wherever possible.  For example, in December 2022, the Board's Chair delivered the following pre-scripted remarks to a large audience of certified public accountants:

> I have said before, and I will say again, the [Board] means business when it comes to enforcement.
>
> We intend to use every tool in our enforcement toolbox and impose significant sanctions, where appropriate, to ensure there are consequences for putting investors at risk and that bad actors are removed.  This includes substantial monetary penalties and significant or permanent individual bars and firm registration revocations.
>
> Those who break the rules—whether they are ethical rules or auditing rules—should know *we won't be constrained by the types of cases the [Board] has pursued in the past.  We won't be limited to the level of penalties that have been seen before*.  And we will seek admissions of wrongdoing in appropriate cases—for example, where the conduct is intentional or egregious.
>
> Don't just take my word for it.  This year, we imposed the highest total penalties in [Board] history.

Erica Y. Williams, "A Challenge to the Audit Profession: Uphold the Highest Standards in Audit Quality" (Dec. 12, 2022) (emphasis added), www.pcaobus.org/news-events/speeches/speech-detail/a-challenge-to-the-audit-profession-uphold-the-highest-standards-in-audit-quality.

42.     Those remarks doubled down on similar threats made a few weeks earlier:

> At the same time, this Board is approaching enforcement with renewed vigilance.
>
> We are rethinking how we identify cases, the types of cases we pursue, and the sanctions we impose.
>
> We've more than tripled the total dollar amount of penalties imposed against individuals in 2022 as compared to each of the past five years.  This includes

18

breaking the record for the largest money penalty ever imposed on an individual in a settled case—twice.

Over that same period, we've quadrupled the average penalty against firms in cases where firms fail to meet [Board] reporting requirements. And we've increased the average penalties against firms in all other cases by about 50%.

In the past five years, the [Board] assessed penalties against individuals less than half of the time and firms only about 86% of the time. *This year it's 100%.*

Those who break the rules should know we won't be constrained by the types of cases the [Board] has pursued in the past. We won't be limited to the level of penalties that have previously been assessed.

Erica Y. Williams, "Getting It Right: Quality Control and Modernizing PCAOB Standards Effectively" (Nov. 29, 2022) (emphasis added), www.pcaobus.org/news-events/speeches/speech-detail/getting-it-right-quality-control-and-modernizing-pcaob-standards-effectively.

43. Nearly verbatim boasts and threats were included in several other speeches. More recently, the Board Chair has repeatedly touted the abrupt escalation of Board-imposed penalties without articulating any substantive explanation of how these skyrocketing penalties might improve audit quality or further investor protection, much less be reconciled with the Board's own precedent. Similar boasts and threats are contained in the Board's most recent annual report, and they are regularly featured on the Board's social media platforms. This kind of purposeful public saber-rattling would be unimaginable coming from an appellate court in any adjudication system genuinely designed to dispense fair and impartial justice. Yet it is now routine for the Board.

44. The Board's adjudicative history validates Plaintiff's concerns. According to the Board's public website, when sitting as the purportedly impartial appellate adjudicator, the Board in its 22 years of existence has ***never*** overruled a hearing officer who ruled in favor of the Board's prosecution staff. Yet in nearly half the appeals the Board has decided on the merits, the Board has either reinstated charges that were previously dismissed by the hearing officer or materially

19

increased the sanctions imposed by the hearing officer—or both—even where staff prosecutors either didn't request the harsher sanctions on appeal or didn't appeal at all. Given this track record, it is no wonder why nearly everyone pulled into the Board's enforcement vortex eventually capitulates to the Board staff's settlement demands rather than defend themselves, thereby forfeiting all meaningful appeal to the Board members, SEC, or the courts.

45.     In Plaintiff's case there is still more reason to doubt the Board's ability to decide this case impartially, because the Board has already further prejudged his case by issuing public "findings" directly relevant to his case. In a settlement with Plaintiff's former firm and colleagues, the Board issued a public final order in which it made adverse "findings" on many of the facts also alleged in the Board's case against Plaintiff. Shockingly, some of the Board's stated public "findings" in the final settlement order overlap *verbatim* with the allegations contemporaneously made in the Board's case against Plaintiff, which the Board will eventually be called upon to revisit as the purportedly neutral appellate adjudicator. Plaintiff has obvious reason to question Board members' ability to "hold the balance nice, clear and true" when that time comes, not to mention the hearing officer's appetite in the first instance for second-guessing the Board's already issued public factual findings.

### ii.     The Board's Systemic Deprivation of Jury Trial Rights

46.     As previously noted, Board disciplinary proceedings can result in severe quasi-criminal penalties that can far exceed the amounts imposed in SEC cases, in most criminal misdemeanor cases, and even in many criminal felony cases. The Board and its hearing officer can also issue decisions that brand respondents lawbreakers and deprive them of their chosen livelihoods. Yet these proceedings are not conducted by Article III judges, and respondents like Plaintiff are afforded no possibility of a jury trial, two quintessential ingredients of due process of

20

law.  *See generally* Philip Hamburger, Is ADMINISTRATIVE LAW UNLAWFUL 254-56, 275-76, 498-99, 501 (2014).

47.     Instead, as previously noted, Board disciplinary proceedings are overseen and decided by a single Board employee called a hearing officer, with Board prosecutors required to prove their case by a mere preponderance of the evidence.  And unlike disciplinary proceedings conducted by the securities industry self-regulatory organizations upon which the Board was ostensibly modeled, Board disciplinary proceedings include no adjudicator other than the Board-paid hearing officer and the Board members themselves.[4]

### iii.     The Board's Featherweight Burden of Proof

48.     Despite the felony-size monetary fines and other draconian, career-ending sanctions the Board may impose in its secret disciplinary proceedings, the Board's procedural rules conveniently purport to allow Board prosecutors to prevail based upon a mere preponderance of the evidence, *see* Board Rule 5204(a), which has been aptly described as the "rock bottom" lightest burden of proof known to the law, *Charlton v. FTC*, 543 F.2d 903, 907 (D.C. Cir. 1976).  This featherweight burden of proof—particularly in a systemically biased forum devoid of any judges or juries—finds no support in Sarbanes-Oxley or any other statute, and in any event it profoundly violates Board respondents' right to due process of law.  *See generally In re Winship*, 397 U.S. 358 (1970).

---

[4] By stark contrast, for example, disciplinary cases at the Financial Industry Regulatory Authority (FINRA) are typically decided in the first instance by majority vote of a panel of three adjudicators—a FINRA-employed hearing officer flanked by two volunteers from the securities industry who have walked the proverbial mile in the respondent's shoes and are not on FINRA's payroll.  Subsequent appeals are heard by the National Adjudicatory Council, which is comprised of securities industry professionals and other public members—*none* of whom is on FINRA's payroll.

### iv. The Board's Other Systemic Deprivations of Procedural Fairness and Due Process of Law

49.    In addition to depriving respondents of their constitutional right to an impartial adjudicator and a jury trial and allowing guilt to be proved by a mere preponderance of evidence, Board disciplinary proceedings purposefully and systematically deprive respondents in other ways of the procedural fairness required by both the Due Process Clause of the Fifth Amendment to the Constitution and the "fair procedures" requirement of Sarbanes-Oxley Section 105(a) [15 U.S.C. § 7215(a)].

50.    For example, in determining a respondent's guilt or innocence and any appropriate sanctions under the preponderance-of-evidence standard—and despite the severity of the potential sanctions—the hearing officer (and the Board on appeal) can consider hearsay and other unreliable evidence offered by Board prosecutors that would be inadmissible in a court of law.  The hearing officer (and the Board on appeal) also can—and invariably will—draw an adverse evidentiary inference from a respondent's assertion of Fifth Amendment rights.

51.    In addition, prior to the hearing respondents get almost no discovery beyond access to most (although not all) of the investigative file that was amassed by Board prosecutors when they were building their case against the respondent—*i.e.*, when they had strong incentive to accumulate inculpatory evidence and little incentive to seek out exculpatory evidence.  Unlike in comparable adjudicatory processes used by many government agencies (including the SEC), there are no prehearing depositions except in rare circumstances to preserve hearing testimony, and even in those circumstances, the hearing officer has unfettered discretion to grant or deny a respondent's request for such a deposition.

52.    The hearing officer also has unfettered discretion to grant or deny a respondent's request to issue a watered-down version of a document subpoena (called an "accounting board

22

demand"), which can be issued only to a Board-registered accounting firm or an individual associated with such a firm. There is no other document discovery afforded to respondents. Indeed, although Board prosecutors were able to seek SEC subpoena assistance to force non-Board-registered third parties to provide documents and sworn testimony while they were building their case against a respondent, *see* 15 U.S.C. § 7215(b)(2)(d), respondents have no comparable vehicle to obtain such evidence from parties who are beyond the Board's regulatory reach, thus reducing them to begging for voluntary cooperation.[5]

53.    In addition to these significant limits on Board respondents' ability to discover evidence to defend themselves, respondents likewise have no access to potentially favorable legal precedent. Apparently unique among known adjudicative processes, the Board's disciplinary process systematically grants full access to relevant legal precedent only to the hearing officer and the Board's prosecutors. Due to the Star Chamber secrecy provisions of Sarbanes-Oxley, *see* 15 U.S.C. § 7215(b)(5)(A), respondents and their counsel (not to mention the public at large) are systematically denied the ability to discover and rely upon prior Board and hearing officer adjudications in which other respondents mounted a successful defense on dispositive or non-dispositive issues—a critical means by which accused parties have defended themselves since time immemorial. This censorship of respondent-favorable precedent not only tilts the Board's already lopsided playing field even further in favor of the prosecutors, but also fuels a public perception that Board prosecutors are well-nigh invincible while intimidating investigative targets into believing that resistance is futile.

---

[5] In apparent recognition of the unfairness of this imbalance, Board rules would allow respondents to seek SEC subpoenas to compel third parties to provide evidence at the disciplinary hearing. See PCAOB Rule 5424(b). But the SEC declined to approve the relevant rule nearly 20 years ago, adding that it might reconsider if and when the Board and SEC collaborated to develop more specific procedures for allowing respondents this modest ability to level the playing field. Conveniently for Board prosecutors, although not surprisingly, in the ensuing 22 years the SEC and the Board appear to have done exactly *nothing* to rectify this imbalance, so it persists to this day.

23

**F.     The Board's Unconstitutional Taxation, Funding, and Spending**

54.     Unlike most conventional governmental agencies, the Board is not funded through annual congressional appropriations of public funds from the U.S. Treasury.  Instead, the Board is financed through private, evergreen funding from annual taxes it levies upon and collects from publicly traded issuers and from broker-dealers, which are euphemistically called "accounting support fees."  *See* 15 U.S.C. § 7219(d).[6]  Although the Board is statutorily required to obtain SEC approval of its annual budget (including the annual taxes it levies and collects), *see id.* § 7219(b), no congressional appropriations bill is required and, upon information and belief, Congress has no meaningful involvement in or oversight of the Board's annual budget or spending.  Except for a bare-bones public summary the Board releases each year, its budget—and the process through which it was arrived at—is concealed from public view.

55.     Primarily through the taxes it levies and collects, the Board raises and spends more than $300 million annually to fund its operations, including disciplinary proceedings like those it is prosecuting against Plaintiff, and to compensate its staff of nearly 1,000 personnel.  The Board's 2024 budget is nearly $385 million, a generous 10% increase over its prior-year budget, which in turn was 13% higher than the year before that.  *See* PCAOB Press Rel., "PCAOB Approves 2024 Budget Guided by Investor Protection" (Nov. 16, 2023), *available at* www.pcaobus.org/news-events/news-releases/news-release-detail/pcaob-approves-2024-budget-guided-by-investor-protection.  As calculated by one SEC commissioner, the Board's budget has increased by 41% over just the past five years.  SEC Commissioner Hester Peirce, "Twenty Years, Forty %?:

---

[6] SEC commissioners have acknowledged that the "accounting support fee" is a tax. *See Commissioner Michael Piwowar, Statement at Open Meeting on 2016 PCAOB Budget,* SEC (Mar. 16, 2016) ("The accounting support fee is a tax.  This tax is assessed by a non-profit corporation under authority granted by Congress. … Companies and broker-dealers are required, under penalty of law, to pay money to the Board for the privilege of merely existing."); *see also Commissioner Hester M. Peirce*, *Statement on PCAOB's Ballooning Budget*, SEC (Dec, 23, 2022) ("The PCAOB budget process is a clunky accountability tool, one ill-suited to assess the appropriateness of a tax that now tops $300 million.").

Statement on the 2024 Final Budget and Accounting Support Fee for the Public Company Accounting Oversight Board" (Dec. 13, 2023), *available at* www.sec.gov/news/statement/peirce-statement-pcaob-budget-121323.

56.    Moreover, unlike the monetary penalties collected by the SEC and other government agencies—which typically are deposited in the U.S. Treasury or paid out to victims of wrongdoing and/or whistleblowers—penalties imposed and collected by the Board are diverted to private interests in the form of scholarships awarded to Board-selected college students pursuing degrees in accounting.

**G.    Plaintiff's Ongoing "Here-and-Now" Constitutional Injury**

57.    Plaintiff's ongoing nightmare in the Board's enforcement vortex is not atypical, with the exception that he possesses the rare degree of fortitude necessary to fight back and challenge the Board.

58.    Upon information and belief, the Board's investigation of Plaintiff began more than four years ago, sometime in 2019.  In April 2022, Board prosecutors threatened Plaintiff, through his then-counsel, that they would initiate disciplinary proceedings against him alleging certain failures in connection with audit work performed in early 2018.

59.    In September 2023, the Board instituted its formal disciplinary proceedings against Plaintiff, which remain confidential under the secrecy provisions of Sarbanes-Oxley.  Plaintiff has since filed his answer denying the Board's allegations of wrongdoing, and pre-trial litigation of the matter is proceeding apace with a hearing on the merits currently scheduled before the Board hearing officer starting on October 28, 2024.

25

60.     As a result of the constitutional violations described in this Complaint, Plaintiff is being deprived of his fundamental right to have his fate determined by a neutral, lawfully structured decisionmaker after a full and fair jury trial on the merits.

### FIRST CLAIM FOR RELIEF

### (Usurpation and Relocation of Judicial Power in Violation of Article III of the Constitution)

61.     Plaintiff incorporates and realleges the allegations contained the preceding paragraphs of this Complaint.

62.     The Board is not a court of the United States within the meaning of Article III of the Constitution, and neither its SEC-appointed Board members nor its hearing officer are judges appointed by the President with the advice and consent of the Senate.  They therefore lack any lawful power to decide cases and controversies such as the disciplinary proceeding that is now pending before the hearing officer and subject to appellate review by the Board members.

63.     By adjudicating and ultimately deciding its own case against Plaintiff using its own hearing officer and Board members as the first- and second-line adjudicators, respectively, the Board is usurping and purporting to relocate and vest the "judicial Power of the United States" in a private corporation that has no constitutional power to decide cases or controversies.  It is therefore violating, and unless enjoined will continue to violate, Article III of the Constitution and the constitutional separation of powers, inflicting substantial ongoing harm against Plaintiff.

### SECOND CLAIM FOR RELIEF

### (Exercise of Private, Unsupervised Executive Power in Violation of Article II of the Constitution)

64.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

65.     "A cardinal constitutional principle is that federal power can be wielded only by the federal government.  Private entities may do so only if they are subordinate to an agency." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022) (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15–16 (1939); and *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)).  "If it were otherwise—if people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion."  *Id*. at 880 (quoting THE FEDERALIST No. 51); *see also Dep't of Transp. V. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015), (Alito, J., concurring) ("When it comes to private entities, . . . there is not even a fig leaf of constitutional justification" for delegation).

66.     The Board's investigation, prosecution, and anticipated punishment of Plaintiff constitute exercises of core governmental executive power under color of federal law.  However, as detailed above, these exercises of core executive power are being performed, and continue to be performed, by private actors without any meaningful supervision or direction by SEC or any other governmental agency within the executive branch led by principal officers of the U.S. government, much less by the President.  Worse yet, they are being performed, and will continue to be performed, with only minimal, sporadic supervision and direction from the inferior officers who were appointed by SEC to lead the Board.

67.     By exercising core executive law enforcement power against Plaintiff without meaningful direction and supervision by principal officers of the executive branch, the Board and its staff are violating, and unless enjoined will continue to violate, Article II of the Constitution, inflicting substantial ongoing harm against Plaintiff.

27

## THIRD CLAIM FOR RELIEF

### (Violation of the Appointments Clause of the Constitution)

68.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

69.     Article II, Section 2 of the Constitution provides that Congress may, "by Law," vest the appointment of "inferior Officers" of the United States "in the President alone, in the Courts of Law, or in the Heads of Departments."

70.     The Board is not a Head of Department, and no statute authorizes it to appoint inferior officers of the United States.

71.     The Board hearing officer assigned to superintend and adjudicate the disciplinary proceedings against Plaintiff performs functions that meet the criteria for status as an inferior officer under the Appointments Clause of the Constitution.  To wit, the hearing officer performs important functions while exercising significant discretion and authority and enjoys tenure that is continuous rather than occasional and temporary.  *See generally Lucia v. SEC*, 138 S. Ct. 2044, 2051-54 (2018).  In no plausible sense is the hearing officer simply one of the vast multitudes of "lesser functionaries" employed throughout the regulatory state.  *Id*. at 2051.  The hearing officer's role is functionally equivalent to the role performed by SEC ALJs, who are inferior officers and must be constitutionally appointed by SEC acting as Head of Department under the Appointments Clause.  *Id*. at 2051-42; *see also Jarkesy*, 34 F.4th at 460-63.

72.     Yet the Board hearing officer is not lawfully appointed in accordance with the Appointments Clause.   Upon information and belief, neither SEC nor any other Head of Department appointed the hearing officer.  Instead, he was appointed by the Board, with SEC at most approving the Board's purported appointment after the fact.

28

73.     Because the Board's prosecution of Plaintiff is being superintended, and will soon be adjudicated, by a hearing officer who lacks lawful appointment as an inferior officer, the Board has violated, and if not enjoined will continue to violate, the Appointments Clause of the Constitution, inflicting substantial ongoing harm against Plaintiff.

**FOURTH CLAIM FOR RELIEF**

**(Multi-Layered Tenure Protection in Violation of Article II of the Constitution)**

74.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

75.     Article II of the Constitution is violated when executive branch officers wield power while enjoying multiple layers of protection from removal by the President.  *See generally Free Enter. Fund*, 561 U.S. at 498; *Jarkesy*, 34 F.4th at 463-65.

76.     The Board hearing officer assigned to superintend and adjudicate the disciplinary proceedings against Plaintiff enjoys multiple layers of protection from removal by the President, because in order to remove him, the President would need to prevail upon SEC's tenure-protected commissioners, who would then need to prevail upon the SEC-appointed Board members, who would then need to abide by whatever statutory and private contractual limitations govern the termination of the hearing officer's employment under federal and District of Columbia law.  The hearing officer is therefore "safely encased" within the same kind of "Matryoshka doll of tenure protection" that the Supreme Court ruled unconstitutional in *Free Enterprise Fund*.

77.     Because the Board's prosecution of Plaintiff is being superintended, and will soon be adjudicated, by a hearing officer who enjoys multiple layers of protection from removal by the President, the Board is violating, and unless enjoined will continue to violate, Article II of the Constitution, inflicting substantial ongoing harm against Plaintiff.

29

## FIFTH CLAIM FOR RELIEF

## (Deprivation of Jury Trial Right in Violation of the Sixth and Seventh Amendments to the Constitution)

78.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

79.     Although the Board's prosecution of Plaintiff threatens to brand him a wrongdoer, impose severe financial penalties against him, and deprive him of his chosen livelihood, the Board's adjudication system offers him no possibility of a trial by jury.  Instead, the prosecution is superintended and adjudicated by a single Board-employed hearing officer, with any appeal then channeled to the Board itself rather than to an Article III court.

80.     By depriving Plaintiff of any opportunity to defend himself before a jury, the Board is violating, and unless enjoined will continue to violate, the Sixth and Seventh Amendments to the Constitution, inflicting substantial ongoing harm against Plaintiff.

## SIXTH CLAIM FOR RELIEF

## (Biased and Unfair Process in Violation of the Due Process Clause of the Fifth Amendment to the Constitution and Sarbanes-Oxley Section 105(a))

81.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

82.     Due process of law requires a fair trial in a fair and unbiased tribunal, and Sarbanes-Oxley Section 105(a) requires the Board to establish "fair procedures" for its disciplinary proceedings.

83.     As described above, the Board's disciplinary proceedings are systemically biased, secretive, and drenched in procedural unfairness to accused accountants such as Plaintiff.  Worse

yet, Board rules allow its prosecution staff to establish guilt and the appropriateness of penalties and other sanctions based on a mere preponderance of the evidence.

84.     By prosecuting Plaintiff in such systemically biased, secretive, and unfair proceedings, the Board is violating, and unless enjoined will continue to violate, the Due Process Clause of the Fifth Amendment to the Constitution and the "fair procedures" required by Sarbanes-Oxley Section 105(a), inflicting substantial ongoing harm against Plaintiff.

### SEVENTH CLAIM FOR RELIEF

### (Taxing and Spending in Violation of Article I of the Constitution)

85.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

86.     In our constitutional republic, as George Mason put it in 1787, "[t]he purse & the sword ought never to get into the same hands." *Community Fin. Servs. Ass'n of Am. v. Consumer Financial Protection Bureau*, 51 F.4th 616, 616 (5th Cir. 2022) (quoting 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 139–40 (M. Farrand ed. 1937)).

87.     Article I of the Constitution guarantees this essential separation of purse and sword, thus ensuring the constitutional separation of powers as a bulwark protecting individual liberty. The Framers believed, among other things, that "vesting Congress with control over fiscal matters was the best means of ensuring transparency and accountability to the people." *Id*. at 623, 636. (citing THE FEDERALIST No. 48 (J. Madison)).  They therefore provided in Article I that "[a]ll Bills for raising Revenue shall originate in the House of Representatives," U.S. CONST. art. I, § 7, cl. 1, and granted *to Congress* the power "[t]o lay and collect Taxes" and the power to authorize the expenditure of public funds for public purposes, *id*. art. I, § 8, cl. 1.  Finally, the Framers further provided in Article I that "[n]o money shall be drawn from the Treasury, but in Consequence of

Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." *Id*. art. I, § 9, cl. 7.

88.     Upon information and belief, the Board's taxing and funding scheme is unique across the myriad independent executive agencies and other quasi-governmental regulators created by Congress. The Board is not funded with periodic congressional appropriations, but rather by taxes the Board imposes upon and collects from publicly-traded issuers and broker-dealers—taxes that are euphemistically called "accounting support fees." *See generally* 15 U.S.C. § 7219. Although the Board's annual budget must be approved by SEC's unelected commissioners, Congress plays no meaningful role in approving the Board's annual budget, in assessing the Board's annual taxes on public companies and broker-dealers, in determining how much the Board will spend each year to perform its statutorily assigned duties, or in deciding how the Board will spend those funds.

89.     Primarily through the taxes it imposes and collects from issuers and broker-dealers, the Board raises and spends hundreds of millions of dollars annually to fund its operations, including disciplinary proceedings like those it is prosecuting against Plaintiff, and to compensate the Board staff employees who are prosecuting and superintending those proceedings.

90.     By prosecuting its disciplinary proceedings against Plaintiff using funds that were not appropriated by Congress but rather were raised through taxes levied and collected by the Board itself rather than by Congress, the Board is violating, and unless enjoined will continue to violate, Article I of the Constitution and the constitutional separation of powers, inflicting substantial ongoing harm against Plaintiff.

32

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor granting the following relief:

(i)     An injunction prohibiting the Board from continuing its unlawful and unconstitutional disciplinary proceedings against Plaintiff;

(ii)    A declaratory judgment, pursuant to 28 U.S.C. § 2201(a), declaring that the Board's disciplinary proceedings against Plaintiff are unconstitutional and otherwise unlawful in that they, among other defects:

     a.  usurp and purport to relocate and vest the "judicial Power of the United States" in a private corporation that has no constitutional power to decide cases or controversies, thus violating Article III of the Constitution;

     b.  are an exercise of core executive law enforcement power against Plaintiff without meaningful direction and supervision by principal officers of the executive branch, thus violating Article II of the Constitution;

     c.  are being superintended, and will soon be adjudicated, by a hearing officer who satisfies the criteria for inferior constitutional officer status but lacks lawful appointment as such, thus violating the Appointments Clause of the Constitution;

     d.  are being superintended and adjudicated by a hearing officer who satisfies the criteria for inferior constitutional officer status but lacks lawful appointment as such, thus violating Article II of the Constitution;

     e.  deprive Plaintiff of his right to trial by jury, thus violating the Sixth and Seventh Amendments to the Constitution;

  f. are inherently and systemically biased, secretive, and otherwise unfair, thus violating Plaintiff's rights to due process of law under the Fifth Amendment to the Constitution and "fair procedures" under Sarbanes-Oxley § 105(a); and

  g. are being prosecuted and adjudicated through the expenditure of funds that were not appropriated by Congress but rather were raised through taxes levied and collected by the Board rather than by Congress;

(iii) An award of attorneys' fees and costs to Plaintiff; and

(iv) Such other and further relief as the Court deems just and appropriate.

Dated: March 5, 2024

s/*Thomas K. Potter, III*_____
Thomas K. Potter, III (TN Bar No. 024857)
BURR & FORMAN LLP
222 Second Avenue South
Suite 2000
Nashville, TN 37201
(615) 724-3231
tpotter@burr.com

Russell G. Ryan*
Casey Norman*
Kaitlyn Schiraldi (TN Bar No. 039737)**
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street, NW
Suite 450
Washington, DC 20036
(202) 967-2503
russ.ryan@ncla.legal
* *pro hac vice to be filed*
** *M.D. Tenn admission pending*

*Counsel for Plaintiff John Doe*